711 F.2d 370
 19 ERC 1329, 229 U.S.App.D.C. 92
 UNION OF CONCERNED SCIENTISTS, Petitioner,
v.
NUCLEAR REGULATORY COMMISSION and United States of America,
Respondents,
Nuclear Utility Group on Equipment Qualification, Intervenor.
 No. 82-2000.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 19, 1983.
Decided June 30, 1983.
 
 Petition for Review of an Order of the Nuclear Regulatory commission.
 Ellyn R. Weiss, Washington, D.C., with whom Lee L. Bishop, Williams S. Jordan, III and Diane Curran, Washington, D.C., were on brief, for petitioner.
 Juan L. Rodriguez, Atty., Nuclear Regulatory Com'n, Washington, D.C., with whom E. Leo Slaggie, Acting Sol., Sheldon L. Trubatch, Acting Asst. Gen. Counsel, Nuclear Regulatory Com'n, and Martin Green, Atty., U.S. Dept. of Justice, Washington, D.C., were on brief, for respondents.
 McNeil Watkins, II, Washington, D.C., with whom Nicholas S. Reynolds, Washington, D.C., was on brief, for intervenor. Malcolm H. Philips, Jr., Washington, D.C., also entered an appearance for intervenor.
 Before WALD and MIKVA, Circuit Judges, and MacKINNON, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge MacKINNON.
 MacKINNON, Senior Circuit Judge:
 
 
 1
 This petition concerns the regulation of certain safety-related equipment that is needed to mitigate an accident or to shut down a reactor following an accident in a nuclear power plant. The Union of Concerned Scientists (UCS) petitions this court for review of a June 30, 1982 rulemaking by the Nuclear Regulatory Commission (the NRC or the Commission), which amended all operating licenses by suspending indefinitely the deadline by which nuclear facilities must complete "environmental qualification" of such equipment. Equipment is "environmentally qualified" if it has been proven capable of surviving and performing its function under accident conditions. The June 30, 1982 rule (hereinafter "the interim rule") has now been superseded by another rule on environmental qualification, promulgated on January 6, 1983 (hereinafter "the final rule"). In promulgating the interim rule, however, the Commission made a factual determination upon which the final rule is predicated in part. Because that factual determination was made without affording public notice and opportunity to comment, we grant the petition and remand for further proceedings.I. BACKGROUND
 
 
 2
 This dispute had its origin on November 4, 1977, when UCS filed a petition with NRC to address the ability of safety-related equipment to function in an accident.[1] Petition for Emergency and Remedial Action (Nov. 4, 1977) (Petition) (JA 352).[2] Petitioner adverted to the results of tests conducted under NRC contract at Sandia Laboratories in New Mexico. The tests suggested, inter alia, that certain electrical connectors could not maintain their integrity in the environment that would result from a loss-of-coolant accident.[3] UCS feared that failure of such connectors--and, by implication, other electrical components--during an accident might totally disable vital safety systems. The petition requested NRC to shut down affected operating reactors and to suspend licensing for new plants until licensees could demonstrate that safety-related equipment was qualified to function properly in an accident environment. Id. p 28d, e, f (JA 361-62). The Commission was also petitioned to "direct the Staff to independently verify the environmental qualifications of all safety-related systems, components, and structures." Id. p 28c (JA 361).
 
 
 3
 In response, the Commission swiftly directed its Staff to report by November 9 on any safety matters requiring immediate action. The Staff concluded that no immediate action was warranted.[4] In addition, the Staff issued two Inspection and Enforcement (I & E) Bulletins directing licensees to provide information on electrical connectors in safety systems.[5]
 
 
 4
 The Commission's first formal response to the UCS Petition was issued on April 13, 1978. Petition for Emergency and Remedial Action, CLI-78-6, 7 N.R.C. 400 (1978) (JA 3). Finding on the basis of licensees' replies to Staff inquiries that there was no immediate need to shut down all operating reactors, the Commission denied the petition. Nonetheless, the Commission reported that a few plants had been shut down where subsequent inquiries had indicated that electrical connectors were unqualified and licensees had not justified continued operation pending qualification or replacement.[6] With respect to three other plants that had neither demonstrated qualification nor replaced unqualified components, the Commission permitted continued operation because the licensees had committed to a testing program whose preliminary results appeared promising. Id. at 417-18 (JA 20-21). In all three instances the NRC expressly found that operation pending completion of the tests would not constitute "an undue risk to the public health and safety." Id.
 
 
 5
 As for safety-related equipment other than the electrical connectors that were the subject of the Sandia tests, the NRC directed the Staff to review and evaluate, as "a first-priority matter," the safety, adequacy and environmental qualification of all Class IE electrical equipment[7] in eleven older plants then participating in an ongoing NRC Systematic Evaluation Program (SEP). Id. at 420 & n. 28 (JA 23). Thereafter, the Staff was to determine whether to extend qualification review to all operating plants.[8] Id. at 42 (JA 23).
 
 
 6
 The Commission spent the next two years attempting, with scant success, to obtain documentation of environmental qualification from licensees. Licensee failure to cooperate prompted the Staff to upgrade its documentation request to a requirement in 1979. I & E Bulletin No. 79-01 (Feb. 8, 1979) (JA 45); see Petition for Emergency and Remedial Action, CLI-80-21, 11 N.R.C. 707, 713 (1980) (hereinafter "1980 Order") (JA 61). But licensees still tarried in submitting complete documentation.
 
 
 7
 Frustrated by grudging cooperation from licensees, the NRC in 1980 issued a new order that upgraded its documentation requirement even further. In dismissing a UCS petition to reconsider the 1978 Order, the Commission noted that "some licensees ha[d] ignored" their responsibility and had displayed "a disregard for [the] environmental qualification problem." 1980 Order, supra, 11 N.R.C. at 712, 713 (JA 66, 67). Accordingly, "[i]n order to leave room for no doubt on this issue," the Commission set in motion a process that would elevate its documentation demands to the status of license conditions. Id. at 712 (JA 66). In addition, the NRC ordered that all safety-related electrical equipment in all operating plants be qualified by June 30, 1982. Id. at 714-15 (JA 68-69). The compliance deadline was incorporated into the license conditions and technical specifications of each licensee by individual orders dated October 24, 1980.[9] Finally, the Commission stated that the new deadline did not "excuse a licensee from the obligation to modify or replace inadequate equipment promptly." Id. at 715 (JA 69). Thus, if during the course of its ongoing review, the Staff found "poor" documentation of qualification, or if documentation "raise[d] questions about the ability of the equipment to perform its intended function in accident conditions," the Staff "[would] make a technical judgment regarding continued operation." Id. In other words, the Commission made no finding that operation would necessarily be safe or unsafe until June 30, 1982; that question was entrusted to the technical judgment of the Staff on a case-by-case basis during the course of its ongoing review.
 
 
 8
 Pursuant to I & E Bulletin No. 79-01B, licensees submitted lists of equipment and documentation purporting to demonstrate its qualification. The Staff[10] evaluated these submittals and during the spring of 1981 issued a Safety Evaluation Report (SER) for each of the 72 operating plants. The SERs identified all equipment for which qualification had not been demonstrated.[11] Each licensee was given ten days in which to justify continued operation in the absence of complete qualification. Upon evaluation of the ten-day responses, the Staff found that each plant could safely continue operation in the interim. SECY-82-51, supra note 11, at 1 (JA 220). Each licensee was then given 90 days in which to provide either (1) documentation of missing qualification information or (2) a commitment to corrective action (e.g., replacement of the unqualified component), in which case the licensee would have to provide further justification for operation until such corrective action was complete. Id. at 1-2 (JA 220-21).
 
 
 9
 All 72 licensees chose the second option and submitted the required "90-day responses." Id. at 2 (JA 221). The Franklin Research Center (Franklin) was hired by the Commission to evaluate each of the justifications for continued operation accompanying the responses.[12] Franklin concluded that while 54 licensees had supported their claims that continued operation was justified, 18 had not. Franklin Review, supra note 12, at 6 (JA 171). The Staff made yet another request for information from the 18 licensees whose justifications were deficient. SECY-82-51, supra note 11, at 2-3 (JA 221-22). More information was submitted, and the Staff found by March 23, 1982 that the last 18 reactors could safely continue to operate pending completion of their qualification programs. See Memorandum from William J. Dircks, Executive Director for Operations, to Commissioner Ahearne (Mar. 23, 1982) (JA 254).
 
 
 10
 Throughout this process of obtaining justifications for interim operation, however, the Staff made clear its intention to hold licensees to the June 30, 1982 qualification deadline that had been incorporated into all licenses. See, e.g., Three Mile Island SER, supra note 11, at 11 (JA 89). On June 22, 1981, a group of NRC licensees petitioned the NRC to extend the deadline by 13 months. Petition for Extension of Deadline for Compliance with CLI-80-21 (June 22, 1981) (JA 111). The Staff recommended a one-year extension,[13] while UCS opposed any extension as unsafe.[14] The Commission took no action on the petition at that time.
 
 
 11
 On January 20, 1982, the NRC noticed and sought public comment on a proposed rule respecting environmental qualification. Environmental Qualification of Electric Equipment for Nuclear Power Plants, 47 Fed.Reg. 2876 (1982) (to be codified at 10 C.F.R. pt. 50) (JA 71). The proposed rule generally would codify the Commission's action in the 1980 Order, with two major exceptions. First, it contained a set of explicit criteria that were to be met by each licensee in order to justify the continued operation of each plant despite inadequacies in environmental qualification. These are similar to the criteria contained in the SERs, see note 12 supra, and essentially require a showing that a plant's safety systems will not be disabled by failure of an unqualified component. 47 Fed.Reg. at 2879, col. 1-2 (JA 74). The NRC expected that all justifications for continued operation would be received and evaluated "well in advance of the effective date of the rule." Id. at 2877, col. 2 (JA 72). Second, the proposed rule provided an extension of the June 30, 1982 deadline until the second refueling outage after March 31, 1982.[15] This would extend the deadline approximately two years. In addition, further extensions could be granted to November 30, 1985, on a showing of good cause, and beyond that date, indefinitely, in "exceptional cases." Id. at 2879, col. 1 (JA 74).
 
 
 12
 UCS submitted comments on the proposed rule. Comments by Union of Concerned Scientists on Proposed Rules on Environmental Qualification (Mar. 25, 1982) (JA 401). UCS argued, inter alia, that the proposed extension was unjustified, id. at 5-9 (JA 405-09), that the proposed rule's definition of safety-related equipment was too narrow, id. at 9-13 (JA 409-13), and that the criteria for justifying continued operation pending qualification were "vague and insubstantial" because they deferred to licensee representations based on equipment performance during normal, not accident, conditions. Id. at 8, 16 (JA 408, 416).
 
 
 13
 On May 24, 1982--the day after the Staff reported that the last 18 licensees had demonstrated their capacity to operate safely pending qualification, see page 8 supra--the Staff proposed a final rule. Final Rule "Environmental Qualification of Safety-Related Electric Equipment for Nuclear Power Plants," SECY-82-207 (May 24, 1982) (JA 255). The Commission met in public session on June 1 to consider the proposed final rule. The Commissioners had questions about the final rule as proposed, and the Staff was directed to consider various alternatives, including methods of extending the June 30, 1982 deadline if a final rule could not be promulgated by that date. See Memorandum from Samuel J. Chilk, Secretary, to William J. Dircks, Executive Director for Operations (June 10, 1982) (JA 340). The Staff recommended promulgation of the interim rule which is the subject matter of this litigation.[16]
 
 
 14
 Thus, on June 30, 1982--the deadline established in 1980 for completion of environmental qualification--the NRC promulgated the interim rule, which amended all operating licenses by indefinitely suspending that deadline.[17] The Commission expressly noted the interim nature of its suspension and indicated that the interim rule "will be superseded by the final rule bearing the same section number." Interim Rule, supra note 17, at 28,363, col. 2 (JA 1). The Commission remarked that it had expected to publish a final rule before June 30, but "this ha[d] not proved possible." Id., col. 1 (JA 1). Relying on the "good cause" exception to the Administrative Procedure Act, 5 U.S.C. § 553(b)(B) (1976) (APA), the NRC justified dispensing with public notice and comment as follows:
 
 
 15
 [B]ecause the Commission will be unable to promulgate a final rule by [June 30] and because licensees should not be placed in jeopardy of enforcement action pending promulgation of a revised schedule for implementation of equipment qualification requirements, the Commission finds good cause to dispense with notice and comment. In addition, the Commission has already solicited comments on the proposed rule's schedule delaying implementation beyond June 30 and the final rule will contain a schedule of this type.
 
 
 16
 Interim Rule, supra note 17, at 28,363, col. 3 (JA 1).
 
 
 17
 The Commission also made a finding that all 72 operating plants could safely continue operation despite failure to complete qualification. In support of this finding, the Commission referred to the plant-specific analyses licensees had submitted to justify continued operation. The Commission reported that
 
 
 18
 [o]n the bases [sic] of these analyses, the Commission has determined that continued operation of these plants pending completion of the equipment qualification program, will not present undue risk to the public health and safety.
 
 
 19
 Id., col. 3 (JA 1).
 
 
 20
 The instant petition to review the interim rule was docketed in August. On January 6, 1983, the Commission promulgated its promised final rule.[18] The substantive criteria for environmental qualification are essentially the same as those provided in the proposed rule. Also like the proposed rule, the final rule stops short of setting actual deadlines for completing the qualification program. Instead, the rule calls for the establishment of "schedules" with the "goal" of ultimate qualification by "the second refueling outage after March 31, 1982 or March 31, 1985, whichever is earlier." Final Rule, supra note 18, at 2733, col. 3 (JA 445). The final rule expressly supersedes the interim rule. Id. at 2730, col. 3, 2732, col. 2 (JA 442, 444). The NRC also concluded that "[n]o changes to license or technical specifications are necessary to reflect these new completion dates." Id. at 2730, col. 3 (JA 442).
 
 
 21
 Finally, the Commission deleted from its final rule the proposed rule's requirement that licensees submit justifications for continued operation pending completion of the qualification program. The Commission bottomed this deletion on the rather cryptic remark that "[t]his requirement has been satisfactorily met." Id. at 2732, col. 2 (JA 444). Apparently, this remark alludes to a statement in the interim rule which interpreted the proposed rule[19] as holding out a promise that,
 
 
 22
 if these plant-specific justifications were voluntarily submitted and evaluated by the staff prior to publication of a final rule, this requirement would be deleted.
 
 
 23
 Interim Rule, supra note 17, at 28,363, col. 2 (JA 1) (emphasis added). Since the interim rule had reported the receipt and evaluation of these justifications, upon which the NRC at that time based its finding that continued operation in the absence of qualification presented no undue risk to the public health and safety, see id., col. 2-3 (JA 1), that safety finding was, in effect, incorporated by reference into the final rule.[20]
 
 
 24
 The Commission then filed with this court a motion to dismiss the present UCS petition as moot due to promulgation of the final rule. UCS opposed the motion and subsequently filed a separate petition attacking the final rule as well. A motions panel of this court referred the Commission's motion to this merits panel.
 
 II. MOOTNESS
 
 25
 We are met at the outset by respondent's contention that the UCS petition has been mooted by promulgation of the final rule, which establishes a new compliance schedule for environmental qualification. We disagree.
 
 
 26
 At the heart of the Commission's mootness argument lies its assertion that the sole effect of the interim rule was to suspend the deadline for environmental qualification. As we have observed, however, suspension was granted on the basis of an express finding that continued operation in the absence of qualification would not pose undue risk to the public health and safety. This safety finding, the basis of which has never been subjected to public comment of any kind, was then relied upon in the final rule as a ground for deleting the proposed rule's codification of the requirement that licensees submit detailed analyses justifying interim operation. See Final Rule, supra note 18, at 2729, col. 2 (JA 444). Consequently, in addition to suspending the deadline, the interim rule had the added effect of making a safety determination upon which the final rule is partially predicated. The validity of that safety finding, therefore, remains a live issue which must be reviewable in some forum.
 
 
 27
 We are not persuaded by respondent's attempts to denigrate the safety determination as an insignificant "ancillary finding" or "explanatory background remark" which was "not a part of the rule." Brief for Respondent at 29, 41, 20. Such characterization is belied by the language of the interim rule, which unequivocally purports to predicate its deadline suspension on the safety of continued operation:
 
 
 28
 The Commission has received, and the staff has evaluated, each operating plant licensee's justification for continued operation. On the bases of these analyses, the Commission has determined that continued operation of these plants pending completion of the equipment qualification program, will not present undue risk to the public health and safety.
 
 
 29
 Interim Rule, supra note 17, at 28,363, col. 2-3 (JA 1). As counsel for NRC conceded at oral argument, this is "finding language." Since the finding forms the basis both for amending licenses in the interim rule and for deleting the justification requirement from the final rule, we cannot brush it aside as some stray finding having no legal effect. In short, the safety finding has continuing vitality which has in no way been superseded by promulgation of the final rule.
 
 
 30
 Nor are we persuaded by the Commission's argument that, since the factual record on which the NRC made the safety finding was "extensively supplemented" during the six months separating the promulgation dates of both rules, there is no continuing reliance on the earlier evaluation of plant-specific justifications. Brief for Respondent at 23-24. The NRC refers to its January 6, 1983 affirmation session on the final rule, during which Commission and Staff members discussed 46 plant-specific technical evaluation reports submitted by Franklin Research Center. The final rule, respondent maintains, was thus predicated on these new evaluations, not on the "previous and now outdated analyses" relied on in promulgating the interim rule. Id. at 24. But these technical reports dealt not with justification for continued operation in lieu of qualification, but with progress made toward actual qualification. This point was brought home by P. Shemanski, a technical monitor in the Equipment Qualification Branch, who steered Commissioner Ahearne away from making precisely the same error respondent would have us make regarding these reports:
 
 
 31
 MR. SHEMANSKI: These reports are quite detailed and they generally are two volumes approximately four inches thick. They evaluate each safety related electrical component and they make a judgment as to the qualification status of this particular component and they put it in I believe seven or eight categories.
 
 
 32
 COMMISSIONER AHEARNE: Excuse me. The one thing I guess I will have to take exception to is we have removed something from the final rule [i.e., the requirement that justifications for continued operation be submitted], and the grounds of the removal were that the justification has been satisfactorily provided. That is the rationale we used. So that is past history. It really has to be[:] is the justification that has been provided satisfactory to lead to removal of that requirement out of the rule. That is past history, but it is important past history.
 
 
 33
 MR. SHEMANSKI: I agree that judgment has been made. However, these reports now are detailing in very great detail the actual qualification status of these particular components. Right now of the 46 reports that we have received from Franklin [for] each plant, the equipment is categorized. No. 1, the equipment is put in a category of being qualified. The second category is qualification not established. The third category is qualification pending modification and these TERs are being forwarded to the licensees for corrective action for which deficiencies have been identified. So we are finally getting down to the point in time where action is going to be taken by the licensees to correct any deficiencies that currently exist. However, justification for continued operation has been completed.
 
 
 34
 Transcript of Commission Affirmation Session on Final Rule at 34-35 (Jan. 6, 1983) (JA 449-50) (emphasis added). Indeed, respondent elsewhere concedes that, unlike previous reports focusing on justifications for continued operation, these particular reports "were limited to evaluating the licensees' resolution of the deficiencies [in asserted qualification] identified in the staff's SERs and to evaluating the qualification documentation submitted by the licensees." Brief for Respondent at 14 n. 4 (emphasis added). In other words, the "extensive[ ] supplement[ation]" to which respondent refers related to qualification, not to justification, which the Commission regarded as "past history" when promulgating the final rule. The validity of the interim rule's safety finding thus remains a live issue.[21]
 
 
 35
 It is evident, therefore, that this petition is not moot in the constitutional sense. The dispute is not "abstract, feigned or hypothetical," and no advisory opinion is sought on an issue which lacks the "impact of actuality." Sibron v. New York, 392 U.S. 40, 57, 88 S.Ct. 1889, 1900, 20 L.Ed.2d 917 (1968); accord Alton & Southern Ry. v. International Association of Machinists & Aerospace Workers, 463 F.2d 872, 877 (D.C.Cir.1972). The allegedly invalid safety finding retains its vitality as a predicate to the final rule, and the Commission has thus preserved the "case or controversy" that is the gravamen of this litigation. Cf. Pickus v. United States Board of Parole, 507 F.2d 1107, 1111 (D.C.1974) (Where superseding agency actions repeat the same alleged procedural error, they "preserve, rather than moot, the original controversy.").
 
 
 36
 It is true, as respondent contends, that this issue could also be resolved in a petition to review the final rule. Brief for Respondent at 25. But it does not follow that we must defer review until the UCS challenge to the final rule eventually percolates up to this court. So long as we can grant meaningful relief affecting the controversy that precipitated the litigation, we may, in the interest of sound judicial administration, afford that relief with as much propriety upon review of the interim rule. It was, after all, the interim rule in which the finding was made. Having considered fully the briefs and arguments of the parties, we are loath to turn petitioner away now only to visit upon all parties--and another panel of this court--the burden of trudging through this legal morass once again at a later date. Such a disposition would squander judicial, administrative, and adversarial resources.[22] The UCS petition is not moot.
 
 III. PROCEDURAL CHALLENGES
 
 37
 The Commission's reluctance to resolve this litigation on the merits is understandable, for the rulemaking is rife with procedural error. In amending all operating licenses without affording notice and opportunity to comment, the NRC has evaded the hearing requirement of section 189(a) of the Atomic Energy Act, violated its own procedural rules, and misapplied the "good cause" exception of the APA. Any one of these procedural irregularities is sufficient ground for reversal.[23]
 
 
 38
 A. Section 189(a) of the Atomic Energy Act.
 
 Section 189(a) provides:
 
 39
 In any proceeding under this chapter, for the ... amending of any license ..., and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding.... [T]he Commission may, in the absence of a request therefor by any person whose interest may be affected, issue ... an amendment to an operating license without a hearing, but upon thirty days' notice and publication once in the Federal Register of its intent to do so. The Commission may dispense with such thirty days' notice and publication with respect to any application for ... an amendment to an operating license upon a determination by the Commission that the amendment involves no significant hazards consideration.
 
 
 40
 42 U.S.C. § 2239(a) (1976). The June 30, 1982 interim rule is plainly a "proceeding" for the "amending of [a] license" within the meaning of section 189(a), since it excised from all operating licenses the compliance deadline established by the 1980 Order. The rulemaking is also a "proceeding for the issuance of rules and regulations dealing with the activities of licensees"; the NRC designated its action as a "[f]inal rule," Interim Rule, supra note 17, at 28,363, col. 1 (JA 1), and the Commission does not now dispute that designation. Whether characterized as a license amendment or as a rulemaking, the Commission's action runs afoul of the express terms of section 189(a), which unequivocally requires notice and opportunity to comment for both types of proceedings.[24] Nor can the Commission justify dispensing with notice and comment on the ground that these amendments "involve[ ] no significant hazards determination," as the Commission now insists that the only conceivable finding that might pass for such a determination--the "no undue risk" finding--is an "ancillary finding" lacking any legal effect. Brief for Respondent at 29.
 
 
 41
 The only basis given in the rule for dispensing with notice and comment is an allusion to the "good cause" exception of the APA.[25] Interim Rule, supra note 17, at 28,363, col. 3 (JA 1). The propriety of reliance on that exception is discussed below. See pages 381-383 infra. But even assuming arguendo that the NRC properly interpreted the scope of the exception, the Commission has failed to justify its departure from the strictures of section 189(a). The hearing and notice requirements of the Atomic Energy Act are not subject to the "good cause" exception of the APA. The APA provides that an agency may have recourse to the exception "[e]xcept when notice or hearing is required by statute." 5 U.S.C. § 553(b) (1976) (emphasis added). As its terms clearly indicate, section 189(a) is just such a statute. The Commission's rationale for dispensing with notice and comment would permit the general rulemaking provisions of the APA to swallow the more specific command of the Atomic Energy Act. Such a result would mock the fundamental maxim of statutory construction that the terms of a more specific statute take precedence over those of a more general statute where both statutes speak to the same concerns. Busic v. United States, 446 U.S. 398, 406, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980).[26] The specific requirement of section 189(a) may not be circumvented through the "good cause" exception of the APA.
 
 
 42
 B. The Commission's Rules of Practice and Procedure.
 
 
 43
 Even if section 189(a) did permit dispensing with notice and comment for good cause, the NRC has divested itself of discretion to invoke that exception. The Commission's Rules of Practice and Procedure provide:
 
 
 44
 (a) When the Commission proposes to adopt, amend, or repeal a regulation it will cause to be published ... a notice of proposal rulemaking; ....
 
 
 45
 (b) The notice will include:
 
 
 46
 (2) The manner and time within which interested members of the public may comment
 
 
 47
 ....
 
 
 48
 10 C.F.R. § 2.804 (1982) (emphasis added). Similarly, 10 C.F.R. § 2.805(a) (1982) provides:
 
 
 49
 (a) The Commission will afford interested persons an opportunity to participate in rulemaking through the submission of statements, information, opinions and arguments in the manner stated in the notice.
 
 
 50
 (Emphasis added).
 
 
 51
 On their face, these rules admit no exception to the affording of notice and comment in rulemaking. The NRC has chosen to confine its discretion solely to the regulation of the manner in which comment can take place. And having chosen to grant interested persons "additional procedural rights in the exercise of [its] discretion," Vermont Yankee Nuclear Power Corp. v. NRDC, Inc., 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), the agency is bound by its own rules. United States v. Nixon, 418 U.S. 683, 695-96, 94 S.Ct. 3090, 3101, 41 L.Ed.2d 1039 (1974); Vitarelli v. Seaton, 359 U.S. 535, 539-40, 79 S.Ct. 968, 972-73, 3 L.Ed.2d 1018 (1959); Service v. Dulles, 354 U.S. 363, 388-89, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957).
 
 
 52
 NRC appears to predicate its claimed right to forego notice and comment on its use of the word "manner," as if affording no opportunity to comment is one way of regulating the manner of commenting. See Brief for Respondent at 30-31. While considerable deference is to be accorded the Commission's interpretation of its own rules, North Anna Environmental Coalition v. NRC, 533 F.2d 655, 662-63 (D.C.Cir.1976), this interpretation does violence to the language of the rule and, as Judge John Sanborn once remarked, gives the regulation a "curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." Lynch v. Alworth-Stephens Co., 294 F. 190, 194 (8th Cir.1923) (quoted in Lynch v. Alworth-Stephens Co., 267 U.S. 364, 370, 45 S.Ct. 274, 276, 69 L.Ed. 660 (1925)). When an agency's interpretation of its own rules flies in the face of the language of the rules themselves, it is owed no deference. Shepherd v. MSPB, 652 F.2d 1040, 1043 (D.C.Cir.1981).
 
 
 53
 Nor has the NRC proven its assertion that it "has consistently interpreted the regulations in this way." Brief for Respondent at 31. The only proffered instance of such "consistent interpretation" is Fire Prevention Schedules for Operating Nuclear Power Plants, 45 Fed.Reg. 71,569 (1980) (to be codified at 10 C.F.R. § 50.48). See Brief for Respondent at 31 n. 10. But that rulemaking never even mentions the rules at issue here, and it certainly does not purport to construe them. The NRC merely did there what it did here, i.e., it temporarily suspended, without notice or comment, certain completion schedules pending conclusion of another ongoing rulemaking proceeding. A single, abrupt rulemaking that does not purport to construe the relevant regulations does not constitute a "consistent interpretation" of those regulations. See Shepherd v. MSPB, supra, 652 F.2d at 1043.
 
 
 54
 C. The Propriety of Reliance on the "Good Cause" Exception of the APA.
 
 
 55
 Even if section 189(a) and the Commission's own rules did not prohibit recourse to the "good cause" exception of the APA, the NRC has not supported its application of the exception.
 
 
 56
 The APA provides that notice and comment may be avoided upon a showing that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B) (1976). The two reasons given by the Commission as constituting good cause--its inability to promulgate a final rule on time and its reluctance to place licensees in jeopardy of enforcement action pending issuance of the final rule--are insufficient.
 
 
 57
 Our cases make clear that the exception is confined to emergency actions which are "indeed rare," American Federation of Government Employees v. Block, 655 F.2d 1153, 1157 n. 6 (D.C.Cir.1981), and that "the mere existence of deadlines for agency action ... [does] not in itself constitute good cause." Council of Southern Mountains, Inc. v. Donovan, 653 F.2d 573, 581 (D.C.Cir.1981). In fact, courts have routinely declined to sanction recourse to the exception because of an impending deadline. See, e.g., NRDC v. EPA, 683 F.2d 752 (3d Cir.1982); National Association of Farmworkers v. Marshall, 628 F.2d 604 (D.C.Cir.1980).
 
 
 58
 None of the arguments offered by respondent demonstrate the propriety of its reliance on the exception. NRC seeks to distinguish the case law just noted as involving substantive, not procedural rules. The interim rule, the Commission insists, while not "strictly procedural, ... ha[s] no substantive effect on safety." Brief for Respondent at 34. This apparent reliance on the APA's exception for "procedural rules" or "statements of policy," see 5 U.S.C. § 553(b)(A) (1976), is misplaced. Even assuming arguendo that the "no undue risk" finding is not part of the rule, the NRC has amended plant operating licenses. Such an action is inherently substantive, whatever the Commission's view of its "safety." Moreover, lifting the deadline is not a "statement of policy" akin to announcing an intention not to take enforcement action. Rather, the interim rule alters a binding norm to which licensees must conform. In fact, in promulgating the interim rule the NRC has stripped itself of prosecutorial discretion by legalizing the underlying conduct. See Pickus v. United States Board of Parole, 507 F.2d 1107, 1113 (D.C.Cir.1974).[27]
 
 
 59
 NRC's reliance on Council of Southern Mountains, supra, is also misplaced. That case weighed five factors in reaching the conclusion that an imminent deadline constituted good cause. 653 F.2d at 581-82. But in Council the inability to promulgate a final rule on time was due to circumstances beyond a diligent agency's control. Id. at 581. Here the NRC Staff had recommended extension of the deadline eleven months before June 30, and still the agency tarried. See NRC Staff Response to Petition for Extension of Deadline for Compliance with CLI-80-21, at 10 (July 31, 1981) (JA 133). Given our view in Council that we were responding "guardedly" to an "extremely close case," 653 F.2d at 582, we are unwilling to approve summary action under the more egregious facts of this case.
 
 
 60
 Respondent and intervenor point out that this is not a case in which a deadline alone impelled abrupt agency action. Licensees would have been placed in jeopardy of enforcement action had the deadline not been suspended. Unfortunately, this argument is undercut by the NRC's own adversion to its prosecutorial discretion: the agency could have chosen to take no action or it could have issued, without notice and comment, a "statement of policy" regarding its intent not to enforce the deadline. See 5 U.S.C. § 553(b)(A). Instead, it chose to amend all operating licenses to remove license conditions. While we are reluctant to vacate a rule when an agency could have achieved the same result by doing nothing, the very power to do nothing demonstrates conclusively that the Commission's concern for licensees' "jeopardy" does not rise to the level of an emergency situation falling within the scope of the "good cause" exception. See American Federation of Government Employees v. Block, supra, 655 F.2d at 1157 n. 6.
 
 IV. CONCLUSION
 
 61
 As indicated by the particular facts of this case, the NRC maintains constant vigilance over the safety of nuclear power plants and monitors compliance with safety requirements at each nuclear reactor on a day-to-day basis. Nothing in our opinion today should be read to suggest otherwise. But when the Commission incorporated compliance deadlines into all operating licenses, it saddled itself with the burden of providing an opportunity for public comment when it became necessary to change those deadlines. The Commission may regret having acted as it did in the first instance,[28] but having done so it must comply with the procedures prescribed by law for amending licenses.
 
 
 62
 Accordingly, the decision of the NRC in promulgating the June 30, 1982 interim rule is vacated and remanded for reconsideration in accordance with this opinion. However, the matter will not be resolved solely on the basis of information available as of June 30, 1982; all parties may supplement the record with any relevant data. On remand, therefore, the Commission shall provide an opportunity to comment on the sufficiency of current documentation purporting to justify continued operation pending completion of environmental qualification of safety-related equipment.[29]
 
 
 63
 So ordered.
 
 
 
 [1]
 The petition also sought remedial action with respect to certain fire protection deficiencies. The Commission eventually promulgated new fire protection rules. 10 C.F.R. § 50.48 (1982)
 
 
 [2]
 Citations to the Joint Appendix are designated by "JA."
 
 
 [3]
 Petition p 16 & Attachment A, Memorandum from R. Feit, Research Applications Branch, NRA, to L.S. Tong, Assistant Director for Water Reactor Safety Research, NRC, at 4-5 (Aug. 5, 1977) (JA 365, 370-71)
 
 
 [4]
 Memorandum from Edson Case, Acting Director, Office of Nuclear Regulatory Regulation, to the Commissioners (Nov. 9, 1977) (JA 396). The Staff concluded that "electrical connectors of the type that failed in recent Sandia tests generally are not being used in nuclear power plant safety systems that are required to function under environmental conditions present during a loss of coolant accident." Id. at 1 (footnote omitted) (JA 396)
 
 
 [5]
 I & E Bulletin Nos. 77-05 (Nov. 8, 1977) and 77-05A (Nov. 14, 1977). These Bulletins are discussed in Petition for Emergency and Remedial Action, CLI-78-6, 7 N.R.C. 400, 409-10 & nn. 16-17 (1978) (hereinafter "1978 Order") (JA 12-13)
 
 
 [6]
 See 1978 Order, supra note 5, at 412 (Pilgrim) (JA 15); id. at 415 (Browns Ferry) (JA 18); id. at 417 (D.C. Cook) (JA 20)
 
 
 [7]
 Class IE is the safety classification of electrical equipment and systems essential to emergency reactor shutdown, containment isolation, reactor core cooling, and reactor heat removal. Id. at 407 n. 6 (JA 10)
 
 
 [8]
 The Commission did in fact extend its review of the environmental qualification of all safety-related equipment beyond older, SEP plants to encompass all operating plants. See I & E Bulletin No. 79-01, at 2 (Feb. 8, 1979) (JA 47); I & E Bulletin No. 79-01B at 2-3 (Jan. 14, 1980) (JA 51-52)
 
 
 [9]
 When adding these requirements to existing licenses, the NRC published Federal Register Notices which provided notice of the proposed changes and afforded an opportunity for a hearing upon the request of the licensee or any other interested person. See, e.g., 45 Fed.Reg. 75,369-97 (Nov. 14, 1980); id. at 75,803-18 (Nov. 17, 1980). Apparently, no hearings were requested. By contrast, when the NRC removed the compliance deadline from all licenses in the interim order challenged by the instant petition, it did so without affording any notice or opportunity for comment. See pages 375-376 infra
 
 
 [10]
 While the Staff reviewed most of these submittals, those from the 11 older plants participating in the Systematic Evaluation Program (discussed at pages 372-373 supra ) were reviewed by the Franklin Research Center under contract to NRC. See Brief for Respondent at 12
 
 
 [11]
 SECY-82-51, "Staff Requirements--SECY-81-803B--Proposed Rulemaking, 'Environmental Qualification of Electrical Equipment for Nuclear Power Plants,' " at 1 (Feb. 4, 1982) (hereinafter "SECY-82-51") (JA 220). For an example of an SER, see Safety Evaluation Report by the Office of Nuclear Reactor Regulation, Equipment Qualification Branch, for Metropolitan Edison Company, Three Mile Island Unit 1 (Mar. 24, 1981) (hereinafter "Three Mile Island SER") (JA 75)
 
 
 [12]
 Franklin was not assigned the task of verifying whether equipment identified as qualified by licensees was in fact qualified. Rather, Franklin assessed the justification for continued operation in spite of the presence of unqualified equipment. Franklin described the scope of its review as confined to the following:
 Review the licensee's justification of interim operation and provide [Franklin's] independent analysis which shows whether or not licensee provided technically sound rationale as a basis for justification for continued plant operation.
 Equipment Qualification Review of Licensees' Resolution of Outstanding Issues from NRC Equipment Environmental Qualification Safety Evaluation Reports, Franklin Research Center, at 1 (Jan. 25, 1982) (hereinafter "Franklin Review") (JA 166).
 Franklin was instructed to match the submitted justifications against a set of four criteria, which permitted operation with unqualified equipment only where (1) redundant environmentally qualified equipment is available to perform essentionally the same function; (2) another system is capable of providing the same function as the unqualified system; (3) the unqualified equipment would have performed its safety function prior to failure; or (4) the plant could be safely shut down in the absence of the unqualified equipment. SECY-82-51, supra note 11, App. A (JA 225). These criteria are essentially identical to those contained in the SERs and in the January 20, 1982 proposed rule (discussed at pages 374-375 infra ).
 
 
 [13]
 NRC Staff Response to Petition for Extension of Deadline for Compliance with CLI-80-21, at 10 (July 31, 1981) (JA 133)
 
 
 [14]
 See Union of Concerned Scientists' Response to Petition for Extension of Deadline for Compliance with CLI-80-21 and NRC Staff Response Thereto (Sept. 18, 1981) (JA 144)
 
 
 [15]
 Nuclear power plants typically shut down annually for refueling
 
 
 [16]
 Extension of June 30, 1982 Deadline for Environmental Qualification of Safety-Related Electric Equipment 2 & Enclosure 1 (June 18, 1982) (JA 342, 345-50)
 
 
 [17]
 Environmental Qualification of Electric Equipment, 47 Fed.Reg. 28,363 (1982) (to be codified at 10 C.F.R. § 50.49) (JA 1) (hereinafter "Interim Rule")
 
 
 [18]
 Final Rule on Environmental Qualification of Electric Equipment Important to Safety, 48 Fed.Reg. 2729 (1983) (to be codified at 10 C.F.R. § 50.49) (JA 441) (hereinafter "Final Rule")
 
 
 [19]
 In the Supplementary Information accompanying the proposed rule, the NRC characterized its intentions with respect to the codification of its requirements for plant-specific justification as follows:
 Also included in the proposed rule is a requirement ... for submission of an analysis by licensees to ensure that the plant can be safely operated pending completion of the environmental qualification of electric equipment. The Commission expects that, for each of the currently operating power plants, this analysis and its evaluation by the NRC staff will be completed well in advance of the effective date of this rule. If the licensees of operating power plants fail to provide these analyses in a timely manner, the Commission expects the NRC staff to take the appropriate steps to require that the information be provided and to enforce compliance with this requirement. This requirement has been included in this proposed rule to provide a regulatory basis for enforcement.
 
 
 [47]
 Fed.Reg. at 2877, col. 2 (JA 72) (emphasis added). Although the Commission, in the language quoted above, did not state explicitly that it intended to delete the requirement if analyses were received and evaluated before promulgation of the final rule, it was not unreasonable of the Commission to interpret its own language as implying such an intent: one might reasonably infer that the "expected" satisfaction of the requirement "well in advance" of its proposed codification would render codification unnecessary
 As we have seen, the Commission's "expectation" proved well founded, for the Staff in fact did complete its evaluation of all analyses by March 23--scarcely two months after the proposed rule was noticed. See Memorandum from William J. Dircks, Executive Director for Operations, to Commissioner Ahearne (Mar. 23, 1982) (JA 254). The Staff's internal determination that all plants could continue to operate safely pending qualification was then reported publicly in the interim rule as a ground for amending all licenses to extend the deadline. See Interim Rule, supra note 17, at 28,363, col. 2-3 (JA 1).
 
 
 [20]
 That the interim rule's safety determination was referenced in the final rule was made even more clear by remarks made during the Commission affirmation session on the final rule. See pages 377-378 infra
 
 
 [21]
 Commissioner Ahearne's confusion--as well as that which apparently plagues Commission counsel--is readily understandable. Franklin was first hired to evaluate only the justifications for continued operation. See note 12 supra. Franklin completed that assignment on January 25, 1982, when it reported that all but 18 licensees had supported their claims that continued operation was justified. This first report is set out at JA 165-93. Franklin subsequently reviewed licensees' assertions regarding the qualification of equipment. To this end, the NRC issued a Notification of Contract Extension on July 27, 1982 (JA 419). The completion of this review was expected by March 1983. Brief for Respondent at 14 n. 4. During the second half of 1982, Franklin succeeded in issuing most of these reports on qualification, id., and these are the 46 reports to which Shemanski referred during the January 6, 1983 affirmation session
 A Staff member did remark during the affirmation session that the same evaluations of justifications for continued operation that were relied on in promulgating the interim rule had been reexamined "a couple of months ago" to determine whether the Staff's safety finding needed to be revised now that Franklin would be embarking on a lengthy review of licensees' representations regarding actual qualification. The Staff concluded that revision was unnecessary. Transcript of Commission Affirmation Session on Final Rule at 23 (Jan. 6, 1983) (remarks of G. Lainus). But rereading old evaluations obviously does not mean that "previous and now outdated analyses" have now been "extensively supplemented" or that there is no continuing reliance on the earlier evaluations. The Staff merely reexamined the old factual record and found no reason to alter its belief that continued operation posed no undue risk to the public health and safety.
 
 
 [22]
 In this respect, we note that counsel for intervenor Nuclear Utility Group on Equipment Qualification, which represents nuclear licensees that support the Commission on this appeal, acknowledged at oral argument that the safety finding was made on June 30, 1982; that the finding is reviewable; and that it makes little difference whether review takes place now or upon consideration of a separate petition for review of the final rule
 
 
 [23]
 UCS also contends that the Commission's decision to promulgate the interim rule was "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A) (1976). Because we reverse on procedural grounds and the record will therefore be supplemented on remand, see Part IV infra, we do not reach petitioner's substantive challenges
 
 
 [24]
 We express no opinion on the arguments of the parties on the question whether these amendments must be made by adjudication or whether they fall within that category of license amendments that may be made by rule under section 187 of the Atomic Energy Act, 42 U.S.C. § 2237 (1976). That is a matter for the NRC to determine in the first instance on remand. We merely hold here that notice and an opportunity to comment must be provided whatever administrative route is taken. Section 187 provides that "[t]he terms and conditions of all licenses shall be subject to amendment ... by reason of rules and regulations issued in accordance with the terms of this chapter." 42 U.S.C. § 2237 (emphasis added). Since section 189(a) requires a hearing "in any proceeding for the issuance ... of rules and regulations dealing with the activities of licensees," id. § 2239(a), a license amendment effected pursuant to section 187 but without notice and comment would not be "issued in accordance with the terms of this chapter."
 
 
 [25]
 The Commission also sought to justify dispensing with notice and comment on the ground that it had received comments on the proposed rule, which also would have extended the deadline. Interim Rule, supra note 17, at 28,363, col. 3 (JA 1); see Brief for Respondent at 36-37. The opportunity to comment in a collateral rulemaking does not cure this particular failure to provide notice and opportunity to comment. No opportunity whatsoever has been afforded for public evaluation and participation with respect to the Commission's determination that no undue risk to the public health and safety is posed by continued operation pending qualification. The gravamen of petitioner's challenge is the Commission's failure to allow public comment on plant-specific justifications. The UCS comments on the proposed rule did not address the safety of continued operation of individual plants in the absence of adequate documentation of environmental qualification. See Comments by Union of Concerned Scientists on Proposed Rules on Environmental Qualification (Mar. 25, 1982) (JA 401). UCS was thus foreclosed from any opportunity to comment on licensees' justifications or on the Commission's determination that those justifications supported the deadline suspension
 
 
 [26]
 See also Preiser v. Rodriguez, 411 U.S. 475, 489-90, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973) (specific habeas statute overrides the general terms of section 1983); UNIF. STATUTORY CONSTRUCTION ACT § 17, 14 U.L.A. 529 (1980) ("If a general provision conflicts with a special or local provision, they shall be construed, if possible[,] so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision ....")
 
 
 [27]
 Even if we were inclined to accept the Commission's oblique invocation of the APA's exception for "procedural rules" and "statements of policy," that is not the rationale used by the NRC to justify dispensing with notice and comment. The NRC plainly relied on the "good cause" exception in paragraph (B ) of the APA, not on the exception embodied in paragraph (A ). See Interim Rule, supra note 17, at 28,363, col. 3 (JA 1). We are foreclosed from affirming a decision on a ground different from that relied on by the agency in making the decision. Securities & Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)
 
 
 [28]
 It seems unlikely the NRC will again lock itself into such procedures by deadlines embodied in operating licenses. In its final rule, the Commission eschewed "changes to license or technical specifications ... to reflect these new completion dates." Final Rule, supra note 18, at 2730, col. 3 (JA 442). See also Brief for Respondent at 25-26 ("In this case, there is no reasonable expectation that the same party will be subject to the same action again. Compliance deadlines are not usually incorporated as conditions in power plant operating licenses but, rather, are generally established by rule.")
 
 
 [29]
 As noted, we leave to the NRC the decision whether to proceed by adjudication or rulemaking on this matter. See note 24 supra